IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF TENNESSEE
EASTERN DIVISION

| | | |
|---|---|---|
| ESTATE OF BRENT RENARD RICHARDSON, JR., by Next of Kin PATRICE RICHARDSON, | ) ) ) ) | |
| Plaintiff, | ) | No. 1:24-cv-01128-STA-jay |
| v. | ) ) | |
| CORECIVIC, et al., | ) ) | |
| Defendants. | ) | |

---

### ORDER GRANTING MOTION TO DISMISS OF DEFENDANTS WHITEVILLE CORRECTIONAL FACILITY, CORECIVIC, CHANCE LEEDS, AND KENDRICK SMITH

---

Plaintiff, Patrice Richardson, as Personal Representative of the Estate of Brent Renard Richardson, Jr., filed this action against Whiteville Correctional Facility ("WCF") and its owner CoreCivic, WCF Warden Chance Leeds, WCF Officers Kendrick Smith and William Delgado, individually and officially, the State of Tennessee, and Tennessee Governor William ("Bill") B. Lee.[1] Plaintiff brings her claims under 42 U.S.C. § 1983 for violations of the Eighth and Fourteenth Amendments, negligence under Tennessee law, and related constitutional and statutory violations. (ECF No. 19.) Defendants WCF, CoreCivic, Warden Leeds, and Officer Smith have filed a motion to dismiss (ECF No. 23) pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. Plaintiff has filed a response to the motion (ECF No. 30), and Defendants have filed a reply to the response. (ECF No. 32.)  For the reasons set forth below, the motion to dismiss is **GRANTED**.

---

[1] Officer Delgado is not a party to this motion, and it is unclear from the record whether Delgado has been served with process. The State of Tennessee and Governor Lee have been dismissed from the action. (Ord., ECF No. 35.)

Standard of Review

A defendant may move to dismiss a complaint for failure to state a claim upon which relief can be granted under Federal Rule of Civil Procedure 12(b)(6). In order to avoid dismissal under Rule 12(b)(6), a plaintiff must include in its pleading "either direct or inferential allegations respecting all material elements necessary for recovery under a viable legal theory." *Luis v. Zang*, 833 F.3d 619, 625–26 (6th Cir. 2016) (quoting *Kreipke v. Wayne St. Univ.*, 807 F.3d 768, 774 (6th Cir. 2015)). When assessing the sufficiency of a complaint, the Court must view the factual allegations in the light most favorable to the plaintiff. *Taylor v. City of Saginaw*, 922 F.3d 328, 331 (6th Cir. 2019) (citing *Keys v. Humana, Inc.*, 684 F.3d 605, 608 (6th Cir. 2012)). While the Court must accept all the well-pleaded factual allegations of the pleading as true, the Court need not accept legal conclusions masquerading as fact claims. *Wood v. Moss*, 572 U.S. 744, 757 n.5 (2014) (citing *Ashcroft v. Iqbal*, 556 U.S. 662 (2009)).

A complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). Although this standard does not require "detailed factual allegations," it does require more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action." *Iqbal*, 556 U.S. at 681; *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007). In the final analysis, the plaintiff must allege facts that, if accepted as true, are sufficient "to raise a right to relief above the speculative level" and to "state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Background

The Court accepts the following facts as true for the purpose of deciding this motion only. On June 28, 2023, Brent Richardson ("the Decedent"), an inmate at WCF, was found unresponsive

in his cell. A non-party, Case Manager Tambra Gooch, discovered the Decedent on his cell floor during a "routine count." Officer Delgado and Shift Supervisor Smith initiated CPR and administered doses of Narcan. Officers then transported the Decedent to medical at WCF, where nurses administered additional doses of Narcan. EMS arrived at WCF, and the Decedent was transported to Bolivar General Hospital, where he was later pronounced deceased. An investigation into the events revealed that Delgado failed to perform mandatory rounds and did not address a window violation in the Decedent's cell. As a result, Delgado was placed on administrative leave without pay.

Plaintiff alleges that WCF and CoreCivic were aware of the drug problem within the facility and yet failed to implement adequate measures to prevent the introduction and distribution of drugs within the facility. Warden Leeds was responsible for the management and operations of WCF, while Officer Kendrick was "responsible for supervising correctional officers and ensuring the safety and security of inmates." (Amd. Cmplt. ¶ 6, ECF No. 19.) However, "Defendants Leeds and Smith and these Defendants failed to supervise Delgado or ensure compliance with established safety protocols, creating a foreseeable and preventable risk of harm to Richardson." (*Id.* ¶ 35.) She further alleges that Delgado's "neglect in performing rounds and addressing security violations directly resulted in a lack of timely intervention and medical care for Richardson, contributing to his death." (*Id.* ¶ 26.)

<u>Analysis</u>

Plaintiff has either conceded or has not contested the portions of Defendants' motion contending that (1) Plaintiff's claims are governed by the Eighth Amendment and, therefore, she does not have a claim under the Fourteenth Amendment; (2) Plaintiff's wrongful death claim must be dismissed because "Tennessee's wrongful death statute does not create a new cause of action for the beneficiaries but instead preserves the right of action of the decedent." *Lynn v. City of Jackson*,

63 S.W.3d 332, 335-36 (Tenn. 2001); (3) CoreCivic rather than WCF is the proper defendant to be sued in this matter; (4) Plaintiff's official capacity claims against Defendants Leeds and Smith are redundant in that official capacity claims against individual defendants are really claims against the defendant corporation; and (5) Plaintiff has failed to state a claim against Defendants pursuant to Tenn. Code Ann. §§ 41-1-103 and 8-8-201. Accordingly, the motion to dismiss is granted on these claims.

<u>Section 1983 Claims</u>

Defendants correctly state that §1983 imposes liability on any "person who, under color of any statute, ordinance, regulation, custom or usage, of any State" subjects another to "the deprivation of any rights, privileges, or immunities secured by the Constitution or laws." 42 U.S.C. § 1983. In order to prevail, a § 1983 plaintiff must establish "(1) that there was the deprivation of a right secured by the Constitution and (2) that the deprivation was caused by a person acting under color of state law." *Wittstock v. Mark A. Van Sile, Inc.*, 330 F.3d 899, 902 (6th Cir. 2003). "Section 1983 is not the source of any substantive right, but merely provides a method for vindicating federal rights elsewhere conferred." *Humes v. Gilless*, 154 F. Supp. 2d 1353, 1357 (W.D. Tenn. 2001) (citing *Graham v. Connor*, 490 U.S. 386, 393-94 (1989)).

Generally, local governments are not considered to be "persons" under § 1983 and, thus, are not subject to suit. *Monell v. N.Y.C. Dept. of Social Servs.*, 436 U.S. 658, 691 (1978). The Sixth Circuit has applied the standards for assessing municipal liability to claims against private corporations that operate prisons, such as CoreCivic. *See Thomas v. Coble*, 55 F. App'x 748, 748 (6th Cir. 2003) ("A private corporation that performs the traditional state function of operating a prison acts under the color of state law for purposes of § 1983.") When "execution of a government's [or private prison's] policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the [complained of]

4

injury[,]" municipalities and other local governments [or private prisons] are considered a "person" for purposes of § 1983. *Bd. Of Cnty. Com'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 403 (1997) (citing *Monell*).

Accordingly, § 1983 liability does not attach to CoreCivic based on the actions of its employee tortfeasors under the doctrine of respondeat superior; instead, such liability is imposed on the basis of the prison's own customs or policy. *See Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996) (stating that, although a private corporation that operates a prison acts under the color of state law for purposes of § 1983, a plaintiff may not sue such a corporation solely on the basis of respondeat superior liability); *see also D' Ambrosio v. Marino*, 747 F.3d 378, 386 (6th Cir. 2014) (reiterating that, under § 1983, entities are responsible only for their own illegal acts and may not be held vicariously liable for the actions of their employees (relying on *Connick v. Thompson*, 131 S. Ct. 1350, 1359 (2011)). Thus, plaintiffs who seek to impose liability on private prisons under § 1983 must prove that an action pursuant to an official policy or custom caused their injury.

Official policy includes the decisions or the acts of its policymaking officials. *Pembaur v. Cincinnati*, 475 U.S. 469, 480 – 481 (1986); *see also Bryan Cnty.*, 520 U.S. at 403-04 (explaining that "official policies" are "decisions of … those officials whose acts may fairly be said to be those of the" entity itself). Alternatively, a "custom" is a practice that, while not formally approved, "may fairly subject a [private prison] to liability on the theory that the relevant practice is so widespread as to have the force of law." *Id.* at 404. Such a custom "must include '[d]eeply embedded traditional ways of carrying out state policy.'" *Doe v. Claiborne County, Tenn.*, 103 F.3d 495, 507 (6th Cir.1996) (quoting *Nashville, Chattanooga & St. Louis Ry. Co. v. Browning*, 310 U.S. 362, 369 (1940)).

Absent proof of an unconstitutional policy, a private prison is not liable for a single incident resulting in a constitutional violation. *Oklahoma City v. Tuttle*, 471 U.S. 808, 823-824 (1985). Furthermore, a private prison is not liable unless there is an "affirmative link between the policy and the particular constitutional violation alleged" or "causal connection." *Id.* Thus, to establish liability under § 1983, Plaintiff "must adequately plead (1) that a violation of a federal right took place; (2) that the defendant acted under color of state law; and (3) that the private prison's policy or custom caused that violation to happen." *Bright v. Gallia Cnty., Ohio*, 753 F.3d 639, 660 (6th Cir. 2014) (citing *Lambert v. Hartman*, 517 F.3d 433, 439 (6th Cir. 2008)). *See also Price v. Bailey*, 2009 WL 198962, at *2 (W.D. Mich. Jan. 26, 2009) (explaining that the plaintiff must identify the policy, connect the policy to the governmental entity, and show that the particular injury was incurred because of the execution of that policy).

Here, Plaintiff has generally pled that the Eighth Amendment rights of the Decedent were violated by Defendants. However, Defendants contend that Plaintiff has not pled facts to show an actual Eighth Amendment violation. That is, Defendants contend that Plaintiff has not pled sufficient facts to show that CoreCivic adopted a policy and/or custom of deliberately understaffing WCF or failing to implement safety measures in such a way that would lead to unconstitutional results and has not pled sufficient facts to support a claim that any of the individual defendants had any personal involvement in the Decedent's death.

The Eighth Amendment prohibits cruel and unusual punishment and requires prison officials to "ensure that inmates receive adequate food, clothing, shelter, and medical care, and [to] take reasonable measures to guarantee the safety of the inmates." *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). In order to establish an Eighth Amendment claim for deliberate indifference to an inmate's safety, the inmate must satisfy a two-prong test: (1) the deprivation alleged must be objectively serious and (2) the official responsible for the deprivation must have

6

exhibited deliberate indifference to the inmate's health or safety. *Id.* at 834.  Thus, a plaintiff must demonstrate that "(1) the alleged mistreatment was objectively serious; and (2) the defendant subjectively ignored the risk to the inmate's safety." *Bishop v. Hackel*, 636 F.3d 757, 766 (6th Cir. 2011) (citations omitted).

Plaintiff alleges that CoreCivic's "profit-driven understaffing policy prioritized cost-cutting over inmate safety" and its failure "to implement adequate training and supervision of correctional staff to address contraband issues" (Amd. Cmplt. ¶¶ 48, 102) were the moving force behind the alleged constitutional violations. She also generally alleges that prison officials failed to investigate prior overdoses. However, it is not enough for a complaint to contain conclusory allegations of unconstitutional conduct by persons acting under color of state law. Some factual basis for such claims must be set forth in the pleadings to support the allegations. *Chapman v. City of Detroit*, 808 F.2d 459, 465 (6th Cir. 1986).   "Blanket assertions" or a "formulaic recitation of the elements of a cause of action" are not sufficient to state a claim under § 1983. *Twombly*, 550 U.S. at 555-56 n.3.

Although Plaintiff has alleged that a "policy" of understaffing at WCF led to an influx of illegal drugs that resulted in the death of the Decedent, she does not allege when WCF was understaffed, how it was understaffed, what posts were understaffed, or how understaffing led to the drugs entering WCF.  Additionally, although she alleges that WCF failed to address a known contraband and drug overdose problem at WCF prior to the death of the Decedent, she does not allege when these incidents occurred or what CoreCivic should have done to prevent the overdoses or how the other overdoses were related to that of the Decedent, including that any of the overdoses were in the Decedent's pod.

The necessity for pleading specific facts was discussed in *Zakora v. Chrisman*, 44 F.4th 452 (6th Cir. 2022), and reiterated in *Caraway v. CoreCivic of Tennessee, LLC*, 98 F.4th 679

(6th Cir. 2024). Both *Zakora* and *Caraway* were factually similar to the present one. *Zakora* involved a § 1983 action against officials and employees of Michigan Department of Corrections ("MDOC") and Michigan State Police ("MSP"). The complaint alleged that the defendants were responsible for an inmate's death from an overdose of fentanyl because (1) they failed to protect him from the allegedly rampant problem of drug smuggling at the facility and (2) they failed to promptly investigate two other incidents of drug overdoses in the inmate's unit that occurred within two days of his own death in violation of the inmate's Eighth Amendment rights. The complaint also alleged that two corrections officers were deliberately indifferent to the inmate's serious medical needs by not heeding warnings from other inmates about the inmate's health status immediately before he died. *Id.* at 460.

The Court summarized the following facts from the amended complaint.

On the morning of January 22, 2017, Zakora was found lying unresponsive in his bunk in the C-Unit of Lakeland by defendant Steven Johnson, a corrections officer at the facility. Responding officers determined that Zakora was already dead due to the presence of rigor mortis, and the cause of death was later found to be accidental fentanyl toxicity. Earlier that morning, another prisoner allegedly told Johnson and/or defendant Chadwick Mobley (another corrections officer at Lakeland) to "check on Mr. Zakora because he was not doing well or because there appeared to be something wrong with him." The complaint alleges that these warnings went unheeded, and that Zakora was never checked on, foreclosing the possibility of any lifesaving medical treatment.

Mobley worked the night shift in Zakora's housing unit from 10:00 p.m. on January 21 until 6:00 a.m. the next morning, at which time Johnson's shift started. Both Johnson and Mobley stated in unrebutted affidavits that they had no knowledge either before or during the night shift that Zakora possessed, ingested, or intended to ingest illegal drugs. Mobley stated that he did not speak with Zakora during that shift, and no one advised him to check on Zakora or to watch Zakora closely. According to Johnson's affidavit, he discovered Zakora dead in his bunk on January 22 at 7:58 a.m., only seconds after a prisoner who was exiting the unit said that Zakora was not "doing too good" or "words to that effect." Johnson also asserts that no one advised him that he should check on Zakora or watch him closely prior to that time.

The C-Unit of Lakeland is a single enclosure that houses between 12 to 16 prisoners. Two other prisoners in the C-Unit were hospitalized from drug overdoses in the two days prior to Zakora's death, but no immediate investigation

was undertaken. After Zakora's death, the MSP brought a drug-detection dog into the facility. The dog's alerts gave positive indications of contraband in the C-Unit.

Zakora's overdose, according to the complaint, was the consequence of a longstanding problem of drug smuggling into Lakeland and other Michigan state prisons. At the time of Zakora's death, illegal drugs were allegedly being smuggled into Lakeland in basketballs that were thrown over the facility's fence. This scheme was allegedly orchestrated by defendant Jane Doe — an unidentified female corrections officer — and a prisoner with whom she was romantically involved.

According to the complaint, an unidentified prisoner had informed defendant Troy Chrisman, an inspector at Lakeland, about the drug-smuggling ring "on more than one occasion prior to Zakora's death, ... provid[ing] information to the officers with details of how the drugs were coming in and who was providing them." Chrisman allegedly relayed this information to another inspector at Lakeland, defendant Matthew Huntley, but neither took any action nor undertook any investigation. This information was then allegedly passed on by Chrisman and Huntley to their supervisors, defendant Bonita Hoffner (the Warden at Lakeland) and defendant Steve Rivard (the Assistant Deputy Director of the MDOC), but they allegedly either ignored the information or instructed Chrisman and Huntley to not investigate the accusations. Defendant Russell Rurka (the Administrative Assistant to the Warden of Lakeland) and defendant Heather Lass (a detective with the MSP) allegedly told Brandy Zakora that they knew about the scheme involving the drug-filled basketballs, but that they had not been able to catch the perpetrator. The prisoner who gave the information to the inspectors was subsequently charged with and convicted of smuggling drugs into Lakeland, allegedly to avoid any internal investigation into the female corrections officer who was involved in the smuggling.

As alleged in the complaint, drug smuggling by corrections officers is a chronic problem throughout the Michigan state prisons. The complaint recounts two incidents from 2016 when MDOC employees reported drug smuggling by corrections officers, but no investigation was undertaken. One of the employees allegedly sent his report to the MSP, and the other emailed his concerns directly to defendant Heidi Washington, the Director of the MDOC. Both of these employees were allegedly fired, only to be reinstated after instituting litigation and a civil-service hearing, respectively.

*Id.* at 460-62.

The Court of Appeals found that the following allegations against the MSP defendants were "insufficient to state an Eighth Amendment failure-to-protect claim." *Id.* at 468.

[T]he MSP Defendants "were involved with the drug smuggling ring and/or a cover up of Mr. Zakora's death," and [] the MSP Defendants "knew that a 'cop/officer' was the person bringing suboxone and heroin into the facility but did

9

not investigate the allegation in determining the source of the drugs that caused Mr. Zakora's death." In addition, the complaint alleged that the MSP Defendants "knew [of] and ... participated in the drug smuggling and knew of the risks and harm associated with dangerous illegal drugs." The complaint also faulted the MSP Defendants for failing to bring a drug-detecting dog in to investigate the presence of contraband in the C-Unit before Zakora's death despite the two prior drug overdoses.

*Id.* at 468. The Court found the complaint to be defective in the following ways.

[It] failed to explain with any specificity how any of the MSP Defendants were involved in the drug-smuggling scheme or how each (or any) of them knew that a police officer was responsible for the operation. Nor did the Estate plausibly allege how any of the MSP Defendants came to obtain any knowledge about the prevalence of drugs at Lakeland, how they ignored that knowledge, or how they failed to curb the introduction, spread, and usage of drugs at Lakeland.

*Id.* "As the district court determined, virtually all of the allegations against the MSP Defendants were 'legal conclusions couched as facts.'" *Id.* (citing *16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, 727 F.3d 502, 504 (6th Cir. 2013) ([A] plaintiff cannot overcome a Rule 12(b)(6) motion to dismiss simply by referring to conclusory allegations in the complaint that the defendant violated the law.")).

However, the appellate court found the allegations against the MDOC defendants to be specific enough to meet the Eighth's Amendment's objective and subjective prongs. As for the objective prong, the complaint generally alleged that "the MDOC Defendants failed to protect Zakora from the dangers of illegal drugs by failing to 'do anything to curb the introduction, spread, and usage of dangerous drugs in prison, despite their direct knowledge from prisoners snitching to them and from two previous overdoses.'" *Id.* at 469. The complaint specifically alleged that drugs were "so prevalent inside Zakora's C-Unit that two other inmates in his 12-to-16-person unit had overdosed in the two days prior to Zakora's death, yet … no investigation was undertaken until after Zakora died. Only after Zakora's death did MDOC officials order a full investigation and have the MSP bring a drug dog into the C-Unit to check for drugs." *Id.* at 470. The Court found that "failing to investigate the presence of drugs after the first two

10

overdoses in Zakora's C-Unit raises the inference that the risk to inmate health from those drugs was "sufficiently serious,' such that Zakora was 'incarcerated under conditions posing a substantial risk of serious harm.'" *Id.* at 470-71 (citing *Farmer*.)

Concerning the subjective prong, the Court found that the complaint sufficiently alleged that the MDOC defendants "had knowledge about the substantial risk of serious harm to a particular class of persons," *id.* at 472, and that Zakora was in that class.

> The two drug overdoses in the relatively small C-Unit of Lakeland that occurred in the two days prior to Zakora's fatal overdose presented a sufficiently obvious risk to infer that the MDOC Defendants who worked within Lakeland (*i.e.*, Chrisman, Huntley, Hoffner, and Rurka) had knowledge of a substantial risk of harm to the other inmates in the C-Unit. Yet they failed to conduct a prompt investigation in an effort to rid the space of the drugs, thereby ignoring the risk of harm to the other prisoners within that space.
> .…
> In addition, the complaint alleges that Inspector Chrisman knew of such a risk to Zakora in particular from the uncontrolled flood of drugs into Lakeland. Specifically, a prisoner allegedly told Inspector Chrisman "of the drug smuggling ring on more than one occasion prior to Mr. Zakora's death and provided information to the officers with details of how the drugs were coming in and who was providing them," giving "step by step details of how and when drugs were entering the facility and ... about the individuals supplying large amounts of drugs to Mr. Zakora." Inspector Chrisman, in turn, allegedly relayed this information to his colleague, Inspector Huntley, and to his supervisors, Warden Hoffner and Assistant Deputy Director Rivard, all of whom likewise failed to act. The prisoner's detailed warning, considered in conjunction with the two prior overdoses, allows us to draw a "reasonable inference" that MDOC Defendants Chrisman, Huntley, Hoffner, Rivard, and Rurka knew of a substantial risk of harm to Zakora.

*Id.* at 472-73 (citing *Iqbal*).  That level of detail and specificity was not pled in the present case.

The allegations here are more akin to those made in *Zakora* against Director Washington which were found to be insufficient.

> The complaint alleges generally that she "had notice that corrections officers were smuggling drugs into prisons." To support this allegation, however, the Estate offers only two alleged incidents from 2016 when MDOC employees at other Michigan correctional facilities reported drug smuggling by corrections officers, but where no investigations were undertaken. Director Washington was allegedly contacted directly by the whistleblower at one of these other facilities, but this

does not support the inference that Director Washington was actually aware of
any substantial risk of harm at Lakeland.

*Id.* at 473.

The *Zakora* Court "acknowledge[d] that the Estate would have no claim if this were

simply a run-of-the-mill drug-overdose case."[2] *Id.*

> Instead, the Estate claims that the relevant prison officials knew of Zakora's
> heavy drug use, knew that two of his immediate cellmates had been hospitalized
> in the 48 hours prior to Zakora's death due to drug overdoses, and yet they failed
> to initiate a timely investigation to remove the lethal substances from that cell that
> would have saved Zakora's life. Because the relevant defendants allegedly knew
> that Zakora was at risk and ignored that risk, this is directly comparable to the
> suicide "deliberate-indifference" cases where this court has allowed the claim to
> proceed beyond the pleading stage.

*Id.* at 473-74 (citation omitted). In the present case, there are no facts alleged in the complaint to

show that Defendants knew that the Decedent was at risk and ignored that risk.

Next, the Court addressed the allegations that "defendants Washington, Hoffner, and

Rivard failed to train and supervise Jane Doe and other prison employees to prevent the entry of

illegal drugs into Lakeland and other MDOC facilities. It also alleged that these defendants failed

to adequately supervise their subordinates by acquiescing in the subordinates' failure to take any

remedial action to address the drug problem at Lakeland."  *Id.* at 474.  The Court affirmed the

dismissal of the claims against Director Washington but reversed the dismissal of the claims

against Hoffner and Rivard.

> Defendants Washington, Hoffner, and Rivard [allegedly] failed to train and
> supervise Jane Doe and other prison employees to prevent the entry of illegal
> drugs into Lakeland and other MDOC facilities. It also alleged that these
> defendants failed to adequately supervise their subordinates by acquiescing in the
> subordinates' failure to take any remedial action to address the drug problem at
> Lakeland.

---

[2]  The use of the term "run-of-the-mill drug-overdose case" was not intended by the *Zakora*
Court to diminish the death of the inmate in that case and is not intended now to diminish the
death of Plaintiff's Decedent.

The Estate claims that the defendants exhibited deliberate indifference by either failing to order a prompt investigation into drug smuggling at Lakeland or by failing to promulgate additional or alternative policies aimed at preventing drug smuggling altogether. With regard to Director Washington, this claim fails. As explained above, the complaint does not adequately allege that Washington knew of the drug problem at Lakeland generally or of the two prior overdoses specifically, which is not surprising considering that the overdoses occurred just two days prior to Zakora's death. There is thus no basis to infer that Washington abdicated her job responsibilities in failing to order a prompt investigation or to take any other action at Lakeland.

The Estate is thus left with the assertion that Washington knew of a drug-smuggling problem throughout MDOC facilities. But to support this, the complaint alleges only that Director Washington was aware of two accusations of officer-involved smuggling at other MDOC facilities, which is insufficient to show a substantial risk of harm to all MDOC inmates. *See D'Ambrosio v. Marino*, 747 F.3d 378, 388 (6th Cir. 2014) (recognizing that a county's knowledge of only three prior instances of constitutional violations by its prosecutors could not establish notice of habitually unconstitutional conduct in support of a failure-to-train claim). Even coupled with the complaint's allegation that "anti[-]overdose drugs have been used approximately 150 times" over the past two years, the allegations are insufficient because the figure is unaccompanied by any context that would allow us to infer that the problem was so severe that Washington "must have known" that all MDOC inmates were at a substantial risk of serious harm. *See Farmer v. Brennan*, 511 U.S. 825, 842–43, 114 S. Ct. 1970, 128 L.Ed.2d 811 (1994). The complaint therefore does not adequately allege that Washington was deliberately indifferent by failing to promulgate additional or alternative policies in MDOC facilities.

Defendants Hoffner and Rivard, however, allegedly did have knowledge of the risk of harm at Lakeland and abdicated their job responsibilities in failing to take steps to abate that risk. The complaint alleges that Warden Hoffner and MDOC Assistant Deputy Director Rivard were told by Inspectors Chrisman and Huntley about the drug-smuggling problem at Lakeland, but Hoffner and Rivard allegedly either ignored the information or instructed Chrisman and Huntley not to investigate the accusations. In either scenario, a plausible claim is stated for failure to train or supervise their subordinates.

Hoffner and Rivard, as supervisors of the inspectors at MDOC, are directly responsible for giving orders to the inspectors. Failing to order an investigation into the drug smuggling, particularly after the two overdoses inside the C-Unit on consecutive days, could be found to constitute "knowing acquiescence" to the constitutional violation of exposing the inmates in the C-Unit to a substantial risk of serious harm. *See Howard v. Knox County*, 695 F. Appx 107, 115 (6th Cir. 2017) (holding that the plaintiff stated a claim for supervisory liability against a school principal by alleging that the principal "made no efforts to investigate, report, train, or terminate" a teacher who abused students, even after receiving complaints about the teacher); *see also Davis v. Monroe Cnty. Bd. of Ed.*, 526

13

U.S. 629, 654, 119 S. Ct. 1661, 143 L.Ed.2d 839 (1999) (concluding that a complaint alleging that a school board "made no effort whatsoever either to investigate or to put an end" to sexual harassment by a classmate "suggests that petitioner may be able to show ... deliberate indifference on the part of the Board").

When supervisors responsible for inmate health and safety ignore known threats to those inmates, they are more than simply failing to act. In *Hill v. Marshall*, 962 F.2d 1209, 1213 (6th Cir. 1992), this court held that that a medical official could be held liable in his supervisory capacity for failing to respond to an inmate's medical needs because he personally ignored the inmate's complaint of not getting medication, and instead referred the complaint to the head nurse whom he knew was altering and destroying the inmate's prescriptions. The court rejected the medical official's argument that his mere "failure to act" was an insufficient basis to hold him liable for the violations of his employee because his actions in ignoring the inmate's complaint meant that he had "abandon[ed] the specific duties of his position." *Id.*

So too here. The complaint adequately alleged that Hoffner and Rivard, in the face of a known threat to inmate safety "*personally* had a job to do" in ordering an investigation into the known presence of drugs at Lakeland (and inside the C-Unit specifically), "and [they] did not do it." *Id.* (emphasis in original). This alleged failure could be found to have directly resulted in a violation of Zakora's Eighth Amendment right to be free from the substantial risk of harm. The Estate has therefore stated a claim for failure to supervise against defendants Hoffner and Rivard.

*Id.* at 476-77.

The Court found that the district court erred in granting the motion to dismiss of Johnson and Mobley but properly granted their motion for summary judgment.

The Estate alleged that Defendants Johnson and Mobley were deliberately indifferent to Zakora's serious medical needs when they failed to check on him after a prisoner, at some point during the "night/early morning" of January 22, 2017, informed them that Zakora was "not doing well" or that "there appeared to be something wrong with him." According to the complaint, Zakora could have received lifesaving medical treatment had Johnson and Mobley timely checked on him.

*Id.* at 477. "Despite these warnings, the complaint alleges, neither Johnson nor Mobley investigated at all. This suffices to state a claim for deliberate indifference to a serious medical need." *Id.* (citation omitted). Therefore, it was error to grant the motion to dismiss. However, summary judgment was appropriate in light of unrefuted affidavits "that neither Johnson nor

Mobley were made aware at any time before Zakora's death that he had, or was planning to, ingest drugs. Moreover, Mobley attested that no one ever told him to check on Zakora, and Johnson checked on Zakora 'only seconds' after another inmate first alerted him to a problem." *Id.* at 478.

The *Caraway* Court pointed out three alleged facts that led to the Court of Appeals' conclusion in *Zakora*.

> First, the complaint contained detailed allegations about the "widespread presence of drugs" at Zakora's facility. Second, in the two days before Zakora's overdose, two other inmates in his twelve-to-sixteen-inmate unit had also overdosed. Third, prison officials failed to investigate those overdoses. Taken together, those factual allegations permitted the reasonable inference that Zakora had "unfettered access to deadly drugs" in prison, creating an objectively excessive risk of overdose.

98 F.4th at 684 (citations omitted). The Court in *Williams v. CoreCivic of Tennessee, LLC*, 2025 WL 952241 (W.D. Tenn. Mar. 28, 2025), compared the facts in *Zakora* to the facts in its own case and found the allegations wanting.

> The first key fact present in *Zakora* is arguably present here. While Plaintiff's claim of a "widespread presence of drugs" in the WCF is not supported by the same type of "detailed allegations" as were present in *Zakora*, see 44 F.4th at 461 (alleging basketballs containing illegal drugs were being tossed over the fence of the facility and that a prisoner had informed an inspector at the facility of a "drug-smuggling" ring and provided details "of how the drugs were coming in and who was providing them"), she does contend that Cole [the decedent] "would routinely refuse periodic drug tests, would test positive for illegal drugs when drug tests were administered, and suffered a prior opioid drug overdose on March 18, 2023." These allegations plausibly allege a widespread presence of drugs at the WCF. However, she has not alleged the other two key facts present in *Zakora*. She points to Cole's prior overdose that was not investigated; but, unlike in *Zakora*, where the prior overdoses and the failure to investigate the same took place in the same small unit and in the two days prior to Zakora's overdose, Cole's prior overdose and the alleged failure to investigate took place in a different unit, two weeks before. There are no allegations of prior overdoses or access to drugs in the KD unit where Cole was housed at the time of his fatal overdose. Importantly, analysis of the objective prong "must consider the likelihood of harm to the injured party *in the context of the circumstances that led to the injury*." *Zakor*a, 44 F.4th at 472 (emphasis added). The relevant context here is the KD unit in the time immediately preceding Cole's overdose and death and Plaintiff has not alleged a presence of illegal substances nor a failure to investigate in this pod.

*Williams*, 2025 WL 952241, at *6 (record citations and some case citations omitted).

The *Williams* Court rejected the plaintiff's argument that CoreCivic engaged in deliberate understaffing, which led to the deprivation of the decedent's constitutional rights because, "[a]s explained in *Caraway*, the failure to adequately staff a prison - even a deliberate failure - is not itself a constitutional violation." 98 F.4th at 685 (citing *Agramonte v. Shartle*, 491 F. App'x 557, 560 (6th Cir. 2012)).

> Plaintiff avers that "[l]ack of sufficient staffing directly leads to the increase of illegal substances, including fentanyl, within prisons because existing staff was not sufficient to conduct proper security searches of individuals entering the prison, including searches of corrections staff." These allegations are similar to those found to be insufficient in *Caraway*. 98 F.4th at 686 ("The complaint contains only generalized allegations that Whiteville's understaffing 'led to' rampant drug use, apparently in part because officials couldn't perform adequate head counts and inspections. That kind of conclusory statement, unaccompanied by factual support, receives no presumption of truth.") (first citing *Iqbal*, 556 U.S. at 678; and then citing *Chapman v. City of Detroit*, 808 F.2d 459, 465 (6th Cir. 1986)). Plaintiff does claim that understaffing "contributed to the lack of searches, sweeps, and inspections within the prison to discover the presence of illegal contraband, including fentanyl and other drugs, which had already been brought into the prison" and attempts to support this claim with the assertion that an hour and a half went by without a head count or security sweep prior to Cole's death, in violation of the set requirement. However, this assertion alone is insufficient to demonstrate more than a "mere possibility" that understaffing is what led to the violation and Cole's death. *Caraway*, 98 F.4th at 686.

*Williams*, 2025 WL 952241, at *7 (record citations omitted).

Looking to the principles set out in *Zakora* and *Caraway* for guidance and as applied in *Williams*, the Court finds that the allegations in the present case do not nearly rise to the level needed to state an Eighth Amendment claim. Instead, Plaintiff's allegations are "conclusory statement[s], unaccompanied by factual support" - a pleading standard that was specifically rejected in *Caraway* based on *Iqbal*.

Concerning CoreCivic, Plaintiff alleges that it had a policy and/or custom of understaffing its facilities and this understaffing led to an influx of illegal drugs which ultimately

16

resulted in the death of the Decedent. However, she asserts no facts to connect that understaffing to the drugs that killed the Decedent. As pointed out by Defendants, she does not cite any recent arrests, incidents, or other facts that would allow the Court to plausibly conclude that there was actually an "ongoing contraband problem" at WCF prior to the Decedent's death, nor does she assert facts necessary to show that there were temporally-proximate prior overdoses at WCF. "A broad assertion that an unconstitutional policy exists is nothing more than a bare recitation of legal standards." *See e.g.*, *Osberry v. Slusher*, 750 F. App'x 385, 398 (6th Cir. 2018). *See also Minick v. Metro. Gov't of Nashville*, 2014 WL 3817116, at *2 (M.D. Tenn. Aug. 4, 2014) ("The court recognizes that presenting municipal liability claims is more difficult after *Twombly* and *Iqbal*, but the prevailing view within this circuit and within this district is that allegations that essentially amount to notice pleading of a municipal liability claim are insufficient."); *Morris v. City of Memphis*, 2012 WL 3727149, at *3 (W.D. Tenn. Aug. 27, 2012) ("Plaintiff's claims regarding Defendant's custom, policy, or practice concerning the misbehavior of the rank and file of its police force amount to legal conclusions unaccompanied by additional factual assertions. Thus, Plaintiff's allegations simply recite the elements of a § 1983 claim.")

Additionally, as in *Williams*, Plaintiff's allegations do not rise to the level of "sufficiently serious" to satisfy the objective prong of the failure-to-protect claim, but, even if they did, Plaintiff has failed to adequately plead the subjective prong. To be held liable under the deliberate-indifference standard, a prison official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety. The official must both be aware of facts from which the inference could be drawn and that a substantial risk of serious harm exists, and he must also draw the inference." *Zakora*, 44 F.4th at 472 (citation omitted). "A factfinder may conclude that a prison official knew of a substantial risk from the very fact that the risk was obvious." *Farmer*, 511 U.S. at 842 (citation omitted). "[T]he correct inquiry is whether [the defendant] had knowledge

17

about the substantial risk of serious harm to a particular class of persons, not whether he knew who the particular victim turned out to be." *Zakora*, 44 F.4th at 472 (second alteration in original) (quoting *Taylor v. Mich. Dep't of Corr.*, 69 F.3d 76, 81 (6th Cir. 1995)). "Deliberate indifference" entails more than just mere negligence. *Cabaniss v. City of Riverside*, 231 F. App'x 407, 414 (6th Cir. 2007). An inmate must show that prison officials had "a sufficiently culpable state of mind" in committing the acts which form the basis of the claim. *Brown v. Bargery*, 207 F.3d 863, 867 (6th Cir. 2000).

Here, Plaintiff appears to allege that Defendants are liable because Delgado "fail[ed] to perform rounds and address the window violation" [3] and supposedly "there had been multiple documented incidents of drug overdoses within the Whiteville Correctional Facility, indicating a known and ongoing issue with contraband substances entering the facility." (Amd. Cmplt. ¶¶ 19, 22.) Plaintiff's factual allegations show that WCF staff (1) discovered the Decedent unresponsive, (2) responded, initiated CPR, and administered Narcan in an attempt to save his life, (3) transported him to medical at WCF, (4) called EMS, (5) transported him to Bolivar General Hospital where - "despite continuous efforts" – the Decedent was later pronounced deceased, and (6) performed an investigation into the incident resulting in discipline against Officer Delgado for violating WCF policy. (*Id.* ¶¶ 12-16, 19-20). These measures do not equate to deliberate indifference.

As for Plaintiff's claim that "there had been multiple documented incidents of drug overdoses" at WCF, a plaintiff must show "a clear and persistent pattern" of unconstitutional conduct. Even citing examples of multiple discrete instances is not enough to draw such a conclusion. *Peet v. City of Detroit*, 502 F.3d 557, 568 (6th Cir. 2007) (concluding that three instances of misconduct is not enough to establish a "custom"); *see also Pineda v. City of*

---

[3] As mentioned above, Delgado is not a party to this motion.

*Houston*, 291 F.3d 325, 329 (5th Cir. 2002) (determining that evidence of eleven incidents of unconstitutional conduct by police officers was insufficient to establish a "custom").

As for Delgado's alleged failure to perform rounds, merely missing cell checks does not equate to deliberate indifference. *See Burwell v. City of Lansing*, 7 F.4th 456, 470-76 (6th Cir. 2021). Similarly, "the failure to follow internal policies [does not], without more, constitute deliberate indifference." *Winkler v. Madison Cnty.*, 893 F.3d 877, 891 (6th Cir. 2018). Moreover, Plaintiff has not alleged any facts showing that Defendants were subjectively aware of a substantial risk of serious harm to the Decedent from which they actually drew such inference. Thus, Plaintiff failed to sufficiently plead facts to demonstrate that any of the movant Defendants acted with deliberate indifference.#

Plaintiff's failure to train and failure to supervise claims fail for the same reasons that those claims failed in *Zakora*. To state a claim based on a failure to train or supervise theory, a plaintiff must plead: (1) the training or supervision was inadequate for the tasks performed; (2) the inadequacy was the result of the municipality's deliberate indifference; and (3) the inadequacy was closely related to or actually caused the injury. *Ellis v. Cleveland Mun. Sch. Dist.*, 455 F.3d 690, 700 (6th Cir. 2006). Plaintiff has pled none of those elements.

As explained in *Zakora*,

> Turning to the adequacy of the complaint's allegations, individual liability on a failure-to-train or supervise theory "must be based on more than respondeat superior, or the right to control employees." *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999) (citation omitted). A simple failure to act, without "a showing of 'direct responsibility' for the actions of the individual officers," will not suffice to establish supervisory liability. *Hays v. Jefferson County*, 668 F.2d 869, 873-74 (6th Cir. 1982) (quoting *Rizzo v. Goode*, 423 U.S. 362, 376, 96 S. Ct. 598, 46 L.Ed.2d 561 (1976)). Instead, "supervisory liability requires some 'active unconstitutional behavior' on the part of the supervisor." *Peatross v. City of Memphis*, 818 F.3d 233, 241 (6th Cir. 2016) (quoting *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999)).

> As relevant here, a supervisor may be liable if he or she "abandons the specific duties of his [or her] position in the face of actual knowledge of a breakdown in

the proper workings of the department." *Winkler v. Madison County*, 893 F.3d
877, 898 (6th Cir. 2018) (citation and internal alterations omitted). The supervisor
must have abdicated his or her job responsibility, and the "*active performance* of
the [supervisor's] individual job function" must have directly resulted in the
constitutional injury. *Gregory v. City of Louisville*, 444 F.3d 725, 752 (6th Cir.
2006) (emphasis in original). This means that, "at a minimum, the plaintiff must
show that the defendant at least implicitly authorized, approved, or knowingly
acquiesced in the unconstitutional conduct of the offending officers." *Peatross*,
818 F.3d at 242 (citation and internal quotation marks omitted). The subjective
prong is the same as it is for the subordinate officers: "The supervisor need not
have known of the substantial risk to the injured party but rather must have
possessed knowledge of potential danger to a particular class of persons."
*Troutman v. Louisville Metro Dep't of Corr.*, 979 F.3d 472, 488 (6th Cir. 2020)
(citation omitted).

*Zakora*, 44 F.4th at 476. *Zakora* allowed the failure to train and/or supervise claims against

Defendants Hoffner and Rivard to go forward because there were allegations that "Warden

Hoffner and MDOC Assistant Deputy Director Rivard were told by Inspectors Chrisman and

Huntley about the drug-smuggling problem at Lakeland, but Hoffner and Rivard allegedly either

ignored the information or instructed Chrisman and Huntley not to investigate the accusations."

*Id.*

Hoffner and Rivard, as supervisors of the inspectors at MDOC, are directly
responsible for giving orders to the inspectors. Failing to order an investigation
into the drug smuggling, particularly after the two overdoses inside the C-Unit on
consecutive days, could be found to constitute "knowing acquiescence" to the
constitutional violation of exposing the inmates in the C-Unit to a substantial risk
of serious harm. *See Howard v. Knox County*, 695 F. App'x 107, 115 (6th Cir.
2017) (holding that the plaintiff stated a claim for supervisory liability against a
school principal by alleging that the principal "made no efforts to investigate,
report, train, or terminate" a teacher who abused students, even after receiving
complaints about the teacher); *see also Davis v. Monroe Cnty. Bd. of Ed.*, 526
U.S. 629, 654, 119 S. Ct. 1661, 143 L.Ed.2d 839 (1999) (concluding that a
complaint alleging that a school board "made no effort whatsoever either to
investigate or to put an end" to sexual harassment by a classmate "suggests that
petitioner may be able to show ... deliberate indifference on the part of the
Board").

*Id.* at 477. Thus, a plaintiff cannot survive a motion to dismiss a failure to train and/or supervise

claim when she fails to plead any facts to support those claims, as in the present case.

20

Plaintiff's allegations that Defendants ratified the unconstitutional actions and omissions of their staff also fail to state a claim. According to Plaintiff, "Defendants CoreCivic, Warden Leeds, and Shift Supervisor Smith ratified the unconstitutional actions and omissions of their subordinates, including those of Officer Delgado, by failing to address, investigate, or discipline these actions effectively." (Amd. Cmplt. ¶ 72). Ratification occurs when an individual with policymaking authority issues a final decision affirming a subordinate's decision and, thereby, adopts it as municipal policy. *St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) (plurality opinion); *Flagg v. City of Detroit*, 715 F.3d 165, 175 (6th Cir. 2013). Even when a plaintiff can show that an official with final decision-making authority ratified a decision, the plaintiff must still "prove that the ratification was a 'moving force' in causing the constitutional violation." *Feliciano v. City of Cleveland*, 988 F.2d 649, 656 (6th Cir. 1993) ("Ratification of a subordinate's action requires more than acquiescence - it requires affirmative approval of a particular decision made by a subordinate.") For ratification by a policymaker's final approval to be the "moving force" behind a constitutional violation, the plaintiff must show that there was a history or pattern of unconstitutional decision-making by the policymakers. *Id.*; *see also Alexander v. Beale St. Blues Co.*, 108 F. Supp. 2d 934, 949 (W.D. Tenn. 1999) ("Even if plaintiffs could prove that the City ratified the officers conduct by failing to discipline them for it, plaintiffs would still have to prove that the ratification was a 'moving force' behind the constitutional violation.")

Here, Plaintiff provides no factual support showing that CoreCivic ratified alleged constitutional violations at WCF. Instead, Plaintiff merely alleges that "CoreCivic leadership's failure to implement meaningful oversight or provide necessary resources to its employees constitutes ratification of the unconstitutional and negligent conduct leading to Richardson's death" - referencing nonspecific, undated, and unfounded "incidents" related to "delayed medical

21

intervention and contraband-related harm." (Amd. Cmplt. ¶¶ 76, 77.) But again, Plaintiff conclusively stating so without reference to any specific instance does not make plausible a claim that ratification of unconstitutional behavior occurred such that was the "moving force" of the Decedent's death. Beyond that, Plaintiff appears to contend the matter was not investigated and no employee was disciplined, despite it being undisputed that an investigation did take place and Delgado was, in fact, disciplined. In short, Plaintiff has failed to plead facts evidencing a history or pattern of unconstitutional decision-making by the policymakers at WCF. Thus, this theory fails.

Plaintiff has also failed to adequately plead liability based on a final policymaker theory. An entity may be liable under Section 1983 for actions of its authorized policymakers when "a deliberate choice to follow a course of action is made from among various alternatives by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986). Here, Plaintiff has not pled any facts to show (1) that any policy acted as the moving force of an alleged constitutional deprivation, or (2) that any of the alleged "policymakers" made a "deliberate choice" to understaff WCF or to allow drugs into the facility. *See Caraway*, 98 F.4th at 686 (determining that, when a complaint "contains only generalized allegations" of "understaffing," such conclusory statements are insufficient to state a claim).

As for the individual defendants, those claims also must be dismissed because Plaintiff fails to make any specific factual allegations against them. To state a cognizable § 1983 claim, the plaintiff must allege some personal involvement by each of the named defendants. *See Heyerman v. County of Calhoun*, 680 F.3d 642, 647 (6th Cir. 2012) (requiring personal involvement to state a § 1983 claim). Likewise, "[b]ecause § 1983 liability cannot be imposed under a theory of respondeat superior, proof of personal involvement is required for a supervisor

22

to incur personal liability." *Grinter v. Knight*, 532 F.3d 567, 575 (6th Cir. 2008) (quoting *Miller v. Calhoun Cnty.*, 408 F.3d 803, 817 n. 3 (6th Cir. 2005)).

The liability of supervisors, such as Leeds and Smith, cannot be based solely on the right to control employees or "simple awareness of employees' misconduct." *Leary v. Daeschner*, 349 F.3d 888, 903 (6th Cir. 2003). Courts have repeatedly explained that a supervisory official's failure to supervise, control, or train the offending individual is not actionable unless the supervisor either encouraged the specific incident of misconduct or in some other way directly participated in it. *See, e.g.*, *Shehee v. Luttrell*, 199 F.3d 295, 300 (6th Cir. 1999). A plaintiff must allege that a supervisory defendant "did more than play a passive role in the alleged violation or showed mere tacit approval of the goings on." *Bass v. Robinson*, 167 F.3d 1041, 1048 (6th Cir. 1999). "At a minimum a plaintiff must show that the official at least implicitly authorized, approved, or knowingly acquiesced in the unconstitutional conduct of the offending officers." *Combs v. Wilkinson*, 315 F.3d 548, 558 (6th Cir. 2002). That is, a plaintiff must demonstrate *personal involvement* by a particular defendant. *See Bass*, 167 F.3d at 1048 (emphasis in original).

# Plaintiff alleges without factual support that Smith, among others, "knew or should have known about the ongoing contraband problem" at WCF. (Amd. Cmplt. ¶ 33). As addressed above, simply stating that a "contraband problem" existed at WCF does not provide a basis for constitutional liability. Moreover, even if Smith were aware of a "contraband problem," that does not make it plausible that Smith was aware of a specific risk of harm to the Decedent which he then disregarded. In that regard, there are no allegations related to any previous interactions between Smith and the Decedent, nor are there any facts alleged showing that Smith knew that the Decedent was specifically at risk for an overdose. In fact, the only interaction Smith had with the Decedent concerns Smith's attempts to save his life after he overdosed.#Plaintiff's failure to

23

allege facts as to what actions Smith failed to take, when he failed to take them, or how those alleged failures led to the Decedent's death is fatal to her claims against Smith.

\#    Plaintiff also makes allegations against Leeds without facts providing a basis for individual liability against him. As with Smith, Plaintiff fails to allege facts to show that Leeds "knew of and disregarded an excessive risk" to the Decedent's health or safety beyond his contention that Leeds and others were aware of a "contraband problem." Plaintiffs alleges that "[b]y failing to investigate or discipline Officer Delgado for neglecting mandatory rounds or ignoring Richardson's distress call, … Leeds and Smith condoned and ratified this conduct as acceptable practice." (Amd. Cmplt. ¶ 78). However, the only factual allegation concerning the purported "distress call" made by the Decedent is that "[a] phone call made by Richardson at 08:47 on the day of the incident [suggested that] Richardson had consumed drugs." (*Id.* ¶ 17). However, there are no allegations (1) about who this call was made to, (2) whether the Decedent voiced being in "distress" or asked for help, or (3) that Leeds or Smith were aware of this phone call. Plaintiff fails to allege what specific actions Leeds failed to take, when he failed to take them, or how those alleged failures led to Decedent's death. Additionally, there is nothing in the complaint alleging that Leeds knew the Decedent, that he was aware the Decedent suffered from any medical distress, or that he knew the Decedent had previously taken illegal drugs. Moreover, Plaintiff concedes that an investigation was conducted concerning the Decedent's overdose and Delgado was disciplined for his actions/inactions.\#

Plaintiff generally alleges that Leeds and Smith had actual knowledge of illegal contraband coming into WCF, but she makes no factual allegations as to what specific information they possessed, how they obtained the information, or when they learned it. This lack of specificity is in contrast to that found in *Zakora* in which two drug overdoses occurred in a small unit in the two days prior to Zakora's fatal overdose. Furthermore, one of the individual

defendants in *Zakora* was given details about the drug smuggling ring by a prisoner prior to the death of the decedent. Those details included "how the drugs were coming in and who was providing them, … step by step details of how and when drugs were entering the facility and … [information] about the individuals supplying large amounts of drugs to Mr. Zakora." 44 F.4th at 472-73. The individual defendant receiving the information passed this information along to a colleague and to the defendant supervisors. "The prisoner's detailed warning, considered in conjunction with the two prior overdoses, allows us to draw a 'reasonable inference' that MDOC Defendants Chrisman, Huntley, Hoffner, Rivard, and Rurka knew of a substantial risk of harm to Zakora." *Id.* at 473. In this case, Plaintiff's claims against the individual defendants are conclusory, and they must be dismissed under Rule 12(b)(6).

Plaintiff has failed to allege facts necessary to establish that an official policy or custom of CoreCivic was the moving force behind any alleged constitutional deprivations related to the death of the Decedent, and CoreCivic cannot be held liable under § 1983 solely on a respondeat superior theory. Accordingly, Plaintiff's § 1983 claims against CoreCivic must be dismissed. Likewise, Plaintiff has failed to plead sufficient facts to state a claim against the individual defendants, and the claims against them must be dismissed as well.

State Law Claims

In light of the dismissal of the federal claims, the Court declines to exercise its supplemental jurisdiction over Plaintiff's state law claims. Retaining supplemental jurisdiction over state claims that arise out of the same facts that form a basis for a federal claim is a matter of discretion with the court. *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 726, (1966); *Vandiver v. Hardin County Board of Education*, 925 F.2d 927, 935 (6th Cir. 1991). The factors to be analyzed in making that determination are judicial economy, comity, convenience, and fairness to the litigants. If all federal claims are dismissed before trial, as in the present case,

the balance of factors will usually point toward dismissal of the state law claims. *Carnegie-Mellon University v. Cohill*, 484 U.S. 343, n.7 (1988). As explained in *Medlin v. City of Algood*, 355 F. Supp. 3d 707 (M.D. Tenn. 2019),

> With the dismissal of Medlin's federal claims against Bilbrey, the Court will not retain jurisdiction over the state law claims against that Defendant because, pursuant to 28 U.S.C. § 1367(c)(3), there is a "strong presumption in favor of declining to exercise jurisdiction over supplemental state-law claims after dismissing federal anchor claims[.]" *Martinez v. City of Cleveland*, 700 F. App'x 521, 523 (6th Cir. 2017). This holds true even where, as here, federal claims remain against other defendants. Retention of state law claims, however, may be appropriate where the case has been pending for a long time, discovery has been completed, the record is voluminous, a court has spent significant time on the litigation, and there are pending motions for summary judgment. *Harper v. AutoAlliance Int'l, Inc.*, 392 F.3d 195, 211 (6th Cir. 2004).

*Medlin*, 355 F. Supp. 3d at 719 (some citations omitted).

As in *Medlin*, this case is neither old nor voluminous. It was filed approximately a year ago on June 21, 2024, and there have only been approximately thirty-five docket entries thus far. No scheduling order has been entered. The only real involvement in this case by the Court so far has been to rule on the present motion and that of the State and Governor Lee. In light of these factors, the Court will not retain jurisdiction over the supplemental state law claims, and those claims are dismissed without prejudice.

Summary and Conclusion

Because Plaintiff has failed to state a claim against Defendants under the Eighth Amendment and the Court declines to exercise supplemental jurisdiction over Plaintiff's state law claims, Defendants' motion to dismiss is **GRANTED**.

The motion is granted with prejudice as to the federal claims, the state law wrongful death claim, and the claim brought pursuant to Tenn. Code Ann. §§ 41-1-103 and 8-8-201. The motion is granted without prejudice as to the remaining state law claims.

**IT IS SO ORDERED**.

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date:   June 2, 2025.